IN THE UNITED STATES COURT OF APPEALS
FOR THE EIGHTH CIRCUIT

NO. 14-2244

MICHAEL JOSEPH SELLERS,

Appellant-Plaintiff,

v.

DEERE & COMPANY a/k/a JOHN DEERE COMPANY, and
CLYDE D'CRUZ, individually,

Appellees-Defendants.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
HONORABLE JON STUART SCOLES
UNITED STATES CHIEF MAGISTRATE JUDGE

## **APPELLANT'S BRIEF**

Gregory T. Racette
Patrick T. Vint
Amy B. Pellegrin
HOPKINS & HUEBNER, P.C.
2700 Grand Avenue, Suite 111
Des Moines, IA 50312
Telephone: (515) 244-0111
Facsimile: (515) 244-8935
gracette@hhlawpc.com
pvint@hhlawpc.com
apellegrin@hhlawpc.com

ATTORNEYS FOR APPELLANT

## SUMMARY OF THE CASE

(pursuant to Eighth Circuit Rule 28A(i)(1))

This appeal addresses the appropriate standard of summary judgment in an employment discrimination case, including actions for age discrimination, disability discrimination, hostile work environment, and retaliation. The Plaintiff-Appellant, Michael Sellers (hereinafter "Sellers") first began working for John Deere in 1979. In 2001, John Deere hired Defendant, Clyde D'Cruz, who thereafter served as the manager over Sellers' department. D'Cruz expressed to Sellers his plan to systematically remove the older employees in that department, and Sellers observed these statements become actions. Sellers became one of the victims of such by a tangible change in working conditions including an extreme increase in workload, as well as preventing future promotional opportunities through D'Cruz's implementation of a company-wide reorganization, Global Jobs Evaluation. The District Court granted summary judgment in favor of Deere.

Oral argument of 20 minutes should be allowed because Sellers presented direct evidence, and issues of material fact exist with regard to the complained-of adverse employment action, claim for hostile work environment, and retaliation.

i

# TABLE OF CONTENTS

**PAGES**

Summary of the Case ................................................................................. i

Table of Authorities .................................................................................. iv

Jurisdictional Statement ........................................................................... vii

Statement of the Issues ............................................................................. ix

Statement of the Case ................................................................................ 1

    1. Relevant Procedural History ........................................................... 1

    2. Relevant Facts ................................................................................. 2

    3. Rulings Presented for Review ....................................................... 26

Summary of the Argument ....................................................................... 28

Argument .................................................................................................. 30

    I.      Scope of Review .......................................................................... 30

    II.     Legal Standard for Summary Judgment ...................................... 30

    III.   Sellers presented direct evidence of discrimination. .................. 33

    IV.   The District Court erred in determining that Sellers failed to
          establish an adverse employment action. ...................................... 39

        a. Global Jobs Evaluation was the tool utilized to effectively
            demote Sellers........................................................................... 41

           i. The District Court refused to view the evidence related to
              GJE in the light most favorable to Plaintiff. ................... 43

Appellate Case: 14-2244    Page: 3    Date Filed: 07/21/2014 Entry ID: 4177255

      ii.  The inaccurate mapping of Sellers through GJE is the adverse employment action, and Defendants' characterization of this as a "misunderstanding" is simply a red herring ................................................................... 46

    b.  Sellers was overworked far beyond the duties of his position as a "Process Pro" creating tangible changes in working conditions, including the hours he worked and the duties he performed ................................................................................. 50

    c.  Conclusion .............................................................................. 54

V.    Sellers suffered from a "disability" within the meaning of the ADA. .............................................................................................. 56

VI.    Sellers engaged in statutorily protected conduct by opposing unlawful employment practices by Clyde D'Cruz. ....................... 57

VII.    Sellers was subjected to adverse employment action by Clyde D'Cruz due to his opposition of D'Cruz's discriminatory practices. 58

VIII.  Genuine issues of material fact exist as to Sellers' claim for hostile work environment. ........................................................................ 59

Conclusion ..................................................................................................... 62

Certificate of Compliance ............................................................................. 64

Proof of Service and Certificate of Filing .................................................... 65

Attorney's Cost Certificate and Virus Scan ................................................. 67

Appellate Case: 14-2244    Page: 4    Date Filed: 07/21/2014   Entry ID: 4177255

# TABLE OF AUTHORITIES

## Cases

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)) ..................................................................... 30–31, 31, 32

*Baer Gallery, Inc. v. Citizen's Scholarship Foundation of America, Inc.*, 450 F.3d 816, 820 (8th Cir. 2006) ........................................................................ 31

*Butler v. Crittenden County*, 708 F.3d 1044, 1048 (8th Cir. 2013) .............. 30

*Causey v. Sewell Cadillac-Chevrolet, Inc.*, 394 F.3d 285, 290 (5th Cir. 2004) 37

*Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) ...................................... 32

*Cossette v. Minn. Power & Light*, 188 F.3d 964, 972 (8th Cir. 1999) ........... 54

*DiCarlo v. Potter*, 358 F.3d 408, 415 (6th Cir. 2004) ................................... 37

*Drake ex rel. Cotton v. Koss*, 445 F.3d 1038, 1042 (8th Cir. 2006) ............. 31

*Elnashar v. Speedway SuperAmerica, LLC*, 484 F.3d 1046, 1055 (8th Cir. 2007) ............................................................................................................. 32

*Febres v. Challenger Caribbean Corp.*, 214 F.3d 57, 61 (1st Cir. 2000) ..... 37

*Jackman v. Fifth Judicial Dist. Dept. of Correctional Services*, 728 F.3d 800, 804 (8th Cir. 2013) ................................................................................. 41, 55

*Jones v. Robinson Prop. Group, L.P.*, 427 F.3d 987, 992 (5th Cir. 2005) ... 37

*Keathley v. Ameritech Corp.*, 187 F.3d 915, 919 (8th Cir. 1999) .................. 32

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) 32

*McCullough v. Univ. of Ark. For Med. Scis.*, 559 F.3d 855, 860–61 (8th Cir. 2009) ............................................................................................................. 34

*Patten v. Wal-Mart Stores East, Inc.*, 300 F.3d 21, 25 (1st Cir. 2002) ......... 37

*Pye v. Nu Aire, Inc.*, 641 F.3d 1011, 1018 (8th Cir. 2011) ............................ 32

*Quick v. Donaldson Co., Inc.*, 90 F.3d 1372, 1377 (8th Cir. 1996)........ 31, 40

*Rakes v. Life Investors Ins. Co. of America*, 582 F.3d 886, 893 (8th Cir. 2009)........................................................................................................... 30

*Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 150 (2000)... 31

*Rheineck v. Hutchinson Tech., Inc.*, 261 F.3d 751, 757 (8th Cir. 2001)...... 61

*Sallis v. University of Minnesota*, 408 F.3d 470 (8th Cir 2005)............. 53, 54

*Simmon v. New Pub. Sch. Dist. No. Eight*, 251 F.3d 1210, 1213, 1214 (8th Cir. 2001)..................................................................................................... 34

*Simpson v. Des Moines Water Works*, 425 F.3d 538, 542 (8th Cir. 2003) .... 32

*Spears v. Missouri Dept. of Correction and Human Resources*, 210 F.3d 850, 853 (8th Cir. 2000).......................................................................... 42, 54

*Stacks v. Southwestern Bell Yellow Pages, Inc.*, 27 F.3d 1316, 1318, 1324 (8th Cir. 1994).............................................................................................. 34

*Torgerson v. City of Rochester*, 643 F.3d 1031, 1045–46 (8th Cir. 2011)... 34

*Wallace v. DTG Operations, Inc.*, 442 F.3d 1112, 1118 (8th Cir. 2006) ..... 58

*Wilkie v. Department of Health and Human Services*, 638 F.3d 944 (8th Cir. 2011)............................................................................................................. 53

## Other

29 U.S.C. § 623(a)(1) (2014) ....................................................... 26,

29 U.S.C. § 623(d) (2014)....................................................... 26, 27

42 U.S.C. § 12102(1)(A) (2014) ...................................... 26, 27, 56

Fed. R. Civ. Pr. 56(c) ................................................................ 30

Iowa Code § 216.6(1)(a) (2014)................................................. 26,

Iowa Code § 216.11(2)......................................................... 26, 27

Appellate Case: 14-2244    Page: 6    Date Filed: 07/21/2014 Entry ID: 4177255

Mark W. Bennett, *Essay: From the "No Spittin', No Cussin' and No Summary Judgment" Days of Employment Discrimination Litigation to the "Defendant's Summary Judgment Affirmed Without Comment" Days: One Judge's Four-Decade Perspective*, 57 N.Y.L. Sch. L. Rev. 685 (2012–2013)33

Milton I. Shadur, *From the Bench: Trial or Tribulations (Rule 56 Style)?*, Litig., Winter 2003, at 5, 5 ........................................................................... 33

Patricia M.Wald, *Summary Judgment at Sixty*, 76 Tex. L. Rev. 1897, 1941 (1998) ...................................................................................................... 32–33

Appellate Case: 14-2244    Page: 7    Date Filed: 07/21/2014 Entry ID: 4177255

# JURISDICTIONAL STATEMENT

A. Michael Sellers initiated this action against Defendants, John Deere & Co. and Clyde D'Cruz, in the District Court of the Northern District of Iowa for age discrimination pursuant to the ADEA (29 U.S.C. § 623(a)(1)), the Iowa Civil Rights Act (Iowa Code § 216.6(1)(a)); disability discrimination pursuant to the Americans with Disabilities Act (42 U.S.C. § 12102(1)(A); retaliation pursuant to the ADEA (29 U.S.C. § 623(a)(1)), and the Iowa Civil Rights Act (Iowa Code § 216.11(2)); and for a hostile work environment pursuant to the ADEA (29 U.S.C. §§ 623(a)(1), 623(d)), the Americans with Disabilities Act (42 U.S.C. § 12102(1)(A)), and the Iowa Civil Rights Act (Iowa Code §§ 216.6(1)(a), 216.11(2)).

B. Jurisdiction in the District Court was proper pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3) as an action under the laws of the United States, as well as supplemental jurisdiction to decide state law claims pursuant to 28 U.S.C. § 1367(a).

C. The District Court granted Defendant's Motion for Summary Judgment and entered a final judgment dismissing the case on May 19, 2014.

D. Plaintiff filed a timely appeal on May 21, 2014.

E. This Court's jurisdiction is based on 28 U.S.C. 1291, which provides

for jurisdiction over a final judgment from a U.S. District Court.

Appellate Case: 14-2244    Page: 9    Date Filed: 07/21/2014 Entry ID: 4177255

## STATEMENT OF THE ISSUES

(a)        Whether the District Court erred in determining as a matter of law Plaintiff did not have direct evidence of age discrimination in violation of the Age Discrimination in Employment Act, 29 U.S.C. § 623(a)(1), and Iowa Civil Rights Act, Iowa Code § 216.6(1)(a).  App. 1625.

Apposite Cases

- *Torgerson v. City of Rochester*, 643 F.3d 1031, 1045–46 (8th Cir. 2011).
- *McCullough v. Univ. of Ark. For Med. Scis.*, 559 F.3d 855, 860–61 (8th Cir. 2009).
- *Simmon v. New Pub. Sch. Dist. No. Eight*, 251 F.3d 1210, 1213, 1214 (8th Cir. 2001).

(b) Whether the District Court erred in determining as a matter of law that Plaintiff had not suffered an adverse employment action under the Age Discrimination in Employment Act, 29 U.S.C. § 623(a)(1), and Iowa Civil Rights Act, Iowa Code § 216.6(1)(a)  App. 1629.

Apposite Cases

- *Jackman v. Fifth Judicial Dist. Dept. of Correctional Services*, 728 F.3d 800, 804 (8th Cir. 2013).
- *Spears v. Missouri Dept. of Correction and Human Resources*, 210 F.3d 850, 853 (8th Cir. 2000).

(c) Whether the District Court erred in determining as a matter of law Plaintiff did not suffer from a "disability" under the Americans with Disabilities Act, 42 U.S.C. § 12102(1)(A).  App. 1632.

Appellate Case: 14-2244     Page: 10     Date Filed: 07/21/2014 Entry ID: 4177255

<u>Apposite Cases</u>

Plaintiff-Appellant relies only on the definition of "disability" as provided by the statute, 42 U.S.C. § 12102(2)(A), and thus no apposite cases are relied upon.

(d) Whether the District Court erred in determining as a matter of law Plaintiff did not engage in any statutorily protected conduct under the Age Discrimination in Employment Act, 29 U.S.C. § 623(d), and Iowa Civil Rights Act, Iowa Code § 216.11(2). App. 1634.

<u>Apposite Cases</u>

- *Wallace v. DTG Operations, Inc.*, 442 F.3d 1112, 1118 (8th Cir. 2006).

(e) Whether the District Court erred in determining as a matter of law Plaintiff had not suffered an adverse employment action under the Age Discrimination in Employment Act, 29 U.S.C. § 623(d), and Iowa Civil Rights Act, Iowa Code § 216.11(2). App. 1635.

<u>Apposite Cases</u>

- *Jackman v. Fifth Judicial Dist. Dept. of Correctional Services*, 728 F.3d 800, 804 (8th Cir. 2013).
- *Spears v. Missouri Dept. of Correction and Human Resources*, 210 F.3d 850, 853 (8th Cir. 2000).

(f) Whether the District Court erred in determining there is no genuine issue of material fact regarding his hostile work environment claim under the

x

Age Discrimination in Employment Act, 29 U.S.C. §§ 623(a)(1), 623(d), the

Americans with Disability Act, 42 U.S.C. § 12102(1)(A), and Iowa Civil

Rights Act, Iowa Code §§ 216.6(1)(a), 216.11(2).  App. 1638.

Apposite Cases

- *Rheineck v. Hutchinson Tech., Inc.*, 261 F.3d 751, 757 (8th Cir. 2001).

## STATEMENT OF THE CASE

1. Relevant Procedural History

Plaintiff-Appellant, Michael Sellers, filed his initial Complaint against

Defendant, John Deere on July 13, 2012, claiming age discrimination,

retaliation, disability discrimination, and wage discrimination. This

Complaint was amended on October 29, 2012, to include claims for

defamation and negligence.

On November 12, 2012, Defendants filed a Motion to Dismiss. The

District Court granted this motion in part and denied it in part. Specifically,

the District Court found that Sellers' claims under the ADA and ADEA

would be dismissed against Clyde D'Cruz individually and would proceed

against John Deere only. Sellers' claim for emotional distress and punitive

damages under the ADEA were dismissed. Sellers' claims for defamation

and negligence were dismissed. Regarding Sellers' claim for wage

discrimination, the District Court limited damages occurring from April 28,

2009 and after.

Sellers filed a Motion to Amend the pleadings to replead a claim for

defamation. This was granted, and a second amended complaint was filed

on March 25, 2013. It included retaliation in violation of the ADEA,

disability discrimination in violation of the ADA, age discrimination in

1

violation of the ADEA, age discrimination in violation of the Iowa Civil Rights Act, retaliation in violation of the Iowa Civil Rights Act, violation of the Iowa Equal Pay Act, and defamation. Defendants filed an answer to this second amended complaint on April 10, 2013.

On February 3, 2014, Defendants filed a Motion for Summary Judgment on all Counts.

On May 19, 2014, the District Court granted Defendants' Motion for Summary Judgment and entered judgment dismissing the case.

2. Relevant Facts

**Michael Sellers Background**

Mike Sellers began his career with John Deere as an inventory analyst in June 1979. App. 1180–81. He later worked as an analyst for a number of Deere departments. App. 1180–81. In 1995, he joined Supply Management as a Supply Management Specialist ("SM Specialist") and remained in that position through April 2002. App. 1180–81. He holds a Bachelor's degree in engineering from Purdue University and a Master's degree in industrial technology from the University of Northern Iowa. App. 1180–81. He also has earned a variety of specialized certificates. App. 627–28.

2

Mike has had ongoing issues with depression beginning around 2000. App. 494 [Sellers dep. p. 16:6-12]. He treated at Black Hawk-Grundy Mental Health Center beginning in November 2000. App. 1472. He began taking anxiety medication soon after. App. 1479–82. However, by 2002, he was stable and making visits to his mental health provider only sporadically. App. 1482–83.

In 2001, Clyde D'Cruz was promoted to become the new supply management (SM) manager at Deere Waterloo Works. App. 136–37 [D'Cruz dep. p. 24-26]. At the time, Mike was working as an SM Specialist, and doing well; his last performance evaluation before Clyde took over included solid marks across the board. App. 1240–48; 530 [Sellers dep. p. 335:22-336:6]. Quickly after becoming supply management manager, D'Cruz made Mike a "process pro." App. 1180–81. D'Cruz was impressed with Mike's ideas, and Mike's managers recommended him. App. 148 [D'Cruz dep. p. 99:18-100:10].

As a process pro, Mike had a wide variety of responsibilities. He first implemented a "PDP playbook" that detailed the procedural steps for going through new product introduction. App. 567; 505 [Sellers dep. p. 79:17-24]. D'Cruz instructed Mike to put together a team of PDP employees to improve the process while the playbook was being developed. App. 505 [Sellers dep.

3

p. 79:17-24]. D'Cruz told others in his department that Mike was his "right-hand man" early in his tenure as supply management manager. App. 530 [Sellers dep. p. 336:14-22]; 147 [D'Cruz dep. p. 93:1-3]. He received positive reviews for his work as a process pro, though D'Cruz did initially try to downgrade him. App. 567–79; 1309–10. After his first year, D'Cruz wrote:

> You have completed a variety of tactical responsibilities assigned to you and done them well. Examples of facilitation and preparation for monthly supply management meetings, the strategic offsite, good job.

App. 575. Mike began taking classes and preparing to become a "Master Process Pro," the next step in his new career path. App. 572.

## D'Cruz begins giving promotions to younger employees and making comments critical of older employees.

Almost immediately after he arrived at Deere in 2001, D'Cruz made his thoughts on older employees known. In 2001, D'Cruz was part of an impromptu meeting with Sellers, Aaron Godfrey, and Patricia Reed at Deere's Product Engineering Center. App. 496 [Sellers dep. p. 22:17-20].

> And Clyde was basically in my eyes trying to paint the picture of where we needed to go in the future. And he very clearly said, "We need to get all these old farts out of here." At the time I took it to mean that – obviously he had been given a

4

pretty challenging task, probably was expected to make big improvements, and so I initially kind of dismissed it as, you know, kind of off the cuff, probably didn't mean what he said.

But when he kept repeating it over and over again, I even tried to pull him aside so that others couldn't hear, and I'd say, "Do you realize that that sounds an awful lot like age discrimination and you may want to temper your words a bit," you know.

App. 496 [Sellers dep. p. 22:20-23:8]. Sellers heard D'Cruz make comments similar to the "We need to get these old farts out of here" statement five to ten times. App. 496 [Sellers dep. p. 24:4-12]. D'Cruz also said that older employees "have got way too much baggage" and "they're no good for us." App. 497 [Sellers dep. p. 24:12-15]. He said they needed to work on "getting the old dogs out of here." App. 497 [Sellers dep. p. 25:6-11]. He would make such comments to groups of supply management department employees, and would generally look at older employees as he was making them. App. 497 [Sellers dep. p. 25:24-26:4].

D'Cruz was not just talk, either. Almost immediately after becoming supply management manager, he began stockpiling young employees in his department. In April 2002, Waterloo Works Corrective Action ("WWCA"), an internal review unit at Deere, conducted an audit of the supply management department. App. 1174–75; 1496–98. The audit found that

5

there was a "gap in the knowledge of supply management employees based on position moves & lack of training." App. 1174–75. Soon after, Mike was assigned the duty of responding to the audit by D'Cruz. App. 1496–98. Sellers spoke with Jim Albro and two other auditors within WWCA about the source of the "gap in knowledge" in supply management. App. 1496–98. Albro told Sellers that the deficiency was due to D'Cruz moving so many new and younger employees into PDP, OFP, and Quality Engineering positions. App. 1496–98. Sellers also found an intellectual and knowledge gap with the young employees in supply management, so significant that it was expected to take ten years to close. App. 1496–98.

D'Cruz's response was to accelerate the hiring and promotion of younger employees. He gave a presentation emphasizing the replacement of older SM Specialists with younger replacements and stressing that the training of these younger employees was crucial to the success of his frequent department reorganizations. App. 1496–98. Sellers began recommending that older, more experienced buyers be moved back into the most critical SM Specialist positions to make up for younger employees who had been promoted without the requisite knowledge or experience. App. 1496–98. D'Cruz responded that, "that was not going to happen." App. 1496–98. D'Cruz told Sellers that "old farts…had way too much baggage." App.

6

1496–98.  Rather than promote experienced employees into critical spots,
D'Cruz demanded that Sellers "find a way to eliminate the jobs of the older
employees in the tactical purchasing area."  App. 1496–97, 1503–4.

**Clyde D'Cruz turns on Mike**

In a 2002 meeting, D'Cruz was critical of Mike's ability to interact with
other managers.  App. 1065 [Sellers dep. p. 74:2-5].  D'Cruz specifically
told him he needed to "play nice in the sandbox."  App. 1065 [Sellers dep. p.
73:17-24].  In early 2003, Mike attended a class on "social styles" in an
attempt to learn how to better resolve conflicts and not be as adversarial in
interacting with others.  App. 1310; 498 [Sellers dep. p. 32:5-13].

When Mike returned from the class, he had a "fairly detailed"
conversation with D'Cruz about purchasing planners.  App. 498 [Sellers dep.
p. 31:17-32:18].  Previously, D'Cruz had been highly critical of the
purchasing planners, referring to them as "sheep that can be slaughtered
later."  App. 496 [Sellers dep. p. 24:16-21].  D'Cruz had also sent emails
critical of the usefulness of purchasing planners.  App. 1064 [Sellers dep. p.
36: 12-15].  Planners were, on average, some of the oldest employees in
supply management, averaging 47 years old at the time.  App. 1350.  Mike
had previously praised the purchasing planners as "very amenable, good-

7

hearted people that would work with us if we'd just carefully explain what we wanted them to do." App. 496 [Sellers dep. p. 24:16-19]. He also noted that the planners and tactical buyers were being significantly underrated by D'Cruz. App.1310.

In defending the purchase planners that D'Cruz wanted to "slaughter," Mike Sellers identified himself as one of them. In D'Cruz's eyes, Mike was now old (he was 44 at the time). App. 1170. And D'Cruz's cleaver was now going to be swung at Mike.

## D'Cruz erupts in anger at Sellers

When Sellers moved to his process pro position, he was given a desk immediately outside D'Cruz's corner office. App. 500 [Sellers dep. p. 53:13-18]. D'Cruz had a tendency to emerge from his office and "throw information" at Mike. App. 500 [Sellers dep. p. 53:19-20].

In summer 2003, Mike was working on supply management's recertification audit. App. 1310. On this particular day, D'Cruz wanted an immediate update on the status of the audit.

> I had just stood up because I was going to go make some copies or something like that, and he wanted to know our status on the audit and what I was doing, and I explained all that, and he started to raise his voice and he started getting fairly intense in

8

his comments. Like, "You do know that we've got to pass this audit." And he made a few other comments like that, and I just looked at him and I said, "I'm going to try my best."

And I'm not sure whether it was the word "try" or something else in that message, but he just exploded and he got probably within six inches of my face. And I was already kind of backed up against my desk. So, I mean, he basically had me pushed into my desk. And he made comments like, "Try is not good enough. You are going to make sure this happens." And he made a few other comments, and by the time he returned to his office, the secretary was laughing her – herself silly as she was handing a Kleenex box over the wall. She goes, "I think you're going to need more than a few of these to clean yourself up," and then she'd make a comment like, "I can't believe that just happened."

App. 500 [Sellers dep. p. 53:21-54:20]. Mike was stunned by D'Cruz's verbal assault. App. 500 [Sellers dep. p. 56:15-17]. At a later staff meeting, D'Cruz again "blew up" at Mike while he was explaining where supply management stood on some metrics. App. 501 [Sellers dep. p. 57:24-58:4].

And with that he just thrust himself out of the chair at the same – I don't even know how to do it to even mimic it, but I mean slamming his fist on the table, jumping up fast enough that his chair went back against the wall. He then pushed himself away from the table – and this was a good sized table, it was probably four feet by eight feet and he pushed it off-center by a foot or two. And then he made a few other choice comments, and by "choice" I'm talking about profanity, left the meeting, slammed the door on the way out, and he slammed it hard enough…that

9

the windows were just rattling.  I was convinced they were
going to shatter but they didn't.

App. 501 [Sellers dep. p. 58:13-59:4].  Sellers was frequently mocked by

other managers loyal to D'Cruz.  App. p. 538 [Sellers dep. p. 376].

Mike realized that D'Cruz was "on a mission":

It was pretty clear to me that Clyde was on a mission.  He had
told me repeatedly that he was going to "get the old farts out of
there," I recognized I was one of them, I could see people
turning over all the time, whether it was in early retirements,
whether it was getting people downgraded, whether it was
shuffling them out of the department, whether it was moving
them to less advantageous positions.  It's like the march was on.

So I thought it was very clear that, you know, it was just a
matter of time before I was going to have the same thing
happen to me.

App. 502 [Sellers dep. p. 61:10-22].

**D'Cruz replaces Sellers with Daria Jerauld**

In August 2003, D'Cruz brought in Daria Jerauld to become the manager

of supply management business processes.  App. 171 [Jerauld dep. p. 15:19-

21].  Jerauld's new position initially was only going to include one

subordinate: Mike Sellers.  App. 172 [Jerauld dep. p. 31:1-6].  Eventually,

10

she took charge of all the "process people" in supply management. App. 172 [Jerauld dep. p. 30:12-15].

Mike began applying for other jobs, expecting D'Cruz's intimidation and discrimination to continue App. 1310–11. Jerauld, however, approached Sellers and asked that he stay. App. 1311. Jerauld told Mike that she needed his expertise. App. 1311. Mike agreed to stay only if he would not be given a "does not fully met expectations" grade, as it would preclude him from moving anywhere else. App. 1311. Jerauld and D'Cruz agreed. App. 1311.

At that time, Mike was the team leader for David Christy, Ofelia Iverson, and Mitch Munson. App. 173 [Jerauld dep p. 33]. He was also given direct supervision of two students in 2004. App. 179 [Jerauld dep. p. 90].

**Mike is prohibited from using conference rooms**

A supply management employee, Royal Jolley, returned to the office in 2004 after heart surgery. App. 1066 [Sellers dep. p. 84:8-14]. While Jolley was attempting to get back up to speed, Mike offered him the desk next to his. App. 1067 [Sellers dep. p. 85:1-17]. Jerauld quickly chastised Jolley for being away from his desk. App. 1067 [Sellers dep. p. 85:18-19]. She

11

then told Sellers that Jolley "has got some real problems." App. 1067 [Sellers dep. p. 86:18].

Sellers had been tasked with training Jolley. App. 506 [Sellers dep. p. 90:7-12]. Jolley had been diagnosed with PTSD, as had Sellers. App. 506 [Sellers dep. p. 89:6-7]. Mike wanted to discuss the situation with Jolley in private, so the two of them went to a vacant conference room. App. 506 [Sellers dep. p. 90:2-10]. After the brief meeting with Jolley, Sellers was called into Daria's office. App. 506 [Sellers dep. p. 90:2-10]. Daria again chastised him for talking with Jolley and told him he should not use conference rooms. App. 507 [Sellers dep. p. 90:13-19].

Mike used spare conference rooms to get away from his phone and be productive, especially when working on a project. App. 536 [Sellers dep. p. 359:2-117. Every other employee in the department was allowed to do the same. App. 536 [Sellers dep. p. 359:2-8].

Mike later had a brief meeting with Wanda Lenius in a vacant conference room; afterwards, he was prohibited from using conference rooms anymore. App. 536 [Sellers dep. p. 359:12-14].

**Mike's job duties increase**

12

Almost immediately, Sellers' position became untenable. In late 2003, Jerauld told Mike that she wanted him to supervise three employees. App. 1311. Mike mentioned that he had been having some problems with depression, but Jerauld told him "You are the only one who can do this." App. 1311. Jerauld also cautioned Mike not to tell D'Cruz about his depression, as it would be considered a sign of weakness. App. 1311.

In November 2003, Sellers was asked to handle Supplier Collaboration, a web-based application used to share documents with suppliers. App. 1311. This added another two to four hours of work per day to Sellers' schedule. App. 1311. From December 2003 through June 2004, Mike handled Trudy Baird's position while she was out on sick leave. App. 1311. Mike's part-time employee, Mitch Munson, was moved to a planner position. App. 1311.

By January, Mike had told Jerauld that his workload was unmanageable. App. 1311. Her response was to simplify the job. App. 1311–12. It only got worse from there. A new planning process that Sellers developed was successful, but meant he was spending another 20 hours per week supporting it. App. 1312. Baird's sick leave was extended through October; Mike stayed in her position. App. 1312. Mike also got tasks thrown at him in the

13

last minute, things that came "out of the blue." App. 516 [Sellers dep. p. 205:11-18].

Not only was Mike's workload increasingly unmanageable, but his direction from D'Cruz and Jerauld was unfocused and scattershot. D'Cruz's secretary even noticed the effect it had on Mike:

> I just remember Clyde would have him going in one direction, and then he would change directions and want him to work on something else. I know that Mike was very frustrated because of the priorities continually changing and not knowing what direction he should be going in.

App. 1074 [Christensen dep. p. 30:3-9]. The combination of D'Cruz's lack of direction and unreasonable expectations made it impossible for Sellers to meet his stated goals.

**The 2004 audit**

The situation came to a head as Mike was responsible for getting supply management into compliance for a scheduled audit in 2004. App. 172 [Jerauld dep. p. 32:12-25]. One of the key areas where the audit found supply management lacking was in bailment agreements. App. 1345–47. Deere frequently would put tooling into another company so that that company could produce parts for use in Deere machines. The bailment agreement would allow Deere to get that tool back should the external

14

company lose the business or go under. App. 1078 [D'Cruz dep. p. 139:12-20]. The bailment agreements protect expensive Deere assets. App. 1078 [D'Cruz dep. p. 139:21-23]. A July 2001 audit found that 94 percent of Deere Waterloo Works' suppliers did not have a bailment agreement or physical validation of the tooling. App. 1333–34. By July 19, 2002, it was claimed by Jerry Gehrke, a division manager in purchasing, that supply management had obtained the proper agreements from 333 of its 390 suppliers. App. 1345–47. Also, Gehrke, the individual handling the audit, issued a response following the audit indicating that supply management had now obtained bailment agreements from 353 of its 390 suppliers. App. 1333–34.

On August 10, 2002, D'Cruz emailed Sellers the report showing 333 of 390 bailment agreements were in place. App. 1345–47. He told Sellers to "own this" and prepare supply management for the next audit. App. 1345. In the meantime, Gehrke continued to pursue bailment agreements; he expected to have full compliance by November 15. App. 1348.

With the outstanding bailment agreements done, Mike worked to put together a "more robust tooling report" to notify Deere when bailments were needed. App. 1335. As a result, 48% of Deere tooling was covered by bailment agreements by May 2004. App. 1336. Mike updated Clyde and

15

the auditors on this at the time. App. 1336. Clyde replied to Sellers' update with, "Awesome response Mike, nice job!" App. 1335.

The audit returned that 57% of bailment agreements and 56% of tooling lists were on file as of September 2004. App. 1337. The result was inexplicable, given that, according to Jerry Gehrke, nearly 100% of the bailment agreements had been obtained by November 2002. App. 1339. In the end, it turned out that the initial number of 91% provided by Jerry Gehrke and Clyde D'Cruz was false. App. 186 [Jerauld dep. p. 110:16-18].

Jerauld initially praised Sellers for his improvement over the 2002 audit. App. 1348. Nevertheless, the repeat audit item brought pressure from upper management on D'Cruz, and D'Cruz responded by blaming Sellers. App. 1340–43. Mike received the "does not fully meet expectations" grade he'd tried to avoid, effectively eliminating any chance of promotion. App. 1340. Jerauld eventually alleged that Sellers had lied to her about the prior bailments. App. 184 [Jerauld dep. p. 118:4-6]. She now admits that the previous figure provided by Gehrke and D'Cruz was likely inflated. App. 184 [Jerauld dep. p. 110:16-18].

**Sellers is "mapped" to an SM Specialist position by D'Cruz**

16

In 2004, Sellers had been a process pro for two years, far removed from his days as a supply management specialist. App. 1180–81. When he moved to process pro in 2002, D'Cruz had specifically told him to leave his duties as a supply management specialist behind:

> As of this past April 1st, I expect that you are totally out of Hydraulics buying, supplier relationships, etc. 100% of your energies should be on your new position, developing new processes and delivering results.

App. 1344. Sellers had also stated his intention to earn a position as a Master Process Pro almost immediately after taking the position. App. 572.

However, when GJE was unveiled on May 1, 2004, Sellers had somehow been mapped by D'Cruz as a supply management specialist, his old position. App. 1176. This was done despite the fact that none of his current job duties matched the supply management specialist description. No explanation has ever been given besides "GJE."

The move to SM Specialist III limited Mike's promotional opportunities. Although there were four classes of supply management specialist, no person in Waterloo had been mapped to an SM Specialist IV position. App. 1176–79. As a Process Pro, Mike was at the low end of a job family, with multiple promotional opportunities. *See* App. 15295. The chance of

17

subsequent promotion was effectively eliminated by the subsequent poor grade, but D'Cruz had effectively cut off any chance of promotion months earlier.

## GJE

Defendants claim that the adverse acts against Michael Sellers were the result of Global Job Evaluation (GJE). In theory, GJE was a blind process for matching employees to jobs across the entirety of Deere's global operations based on numerous criteria. In practice, GJE became another method for Deere management—specifically, D'Cruz—to discriminate against employees on the basis of age and gender.

Defendants designated Richard Sperling as their expert witness with regard to the GJE process. The Hay Group, a global consulting firm, was hired by Deere to implement GJE. Sperling started on the Deere implementation in 2000 or 2001. Deere fully implemented GJE on May 1, 2004. Hay was paid approximately $1.5 million for the Deere project.

GJE was, in theory, a system of mapping employees to uniform job descriptions. As part of implementing GJE, Deere and Hay were to identify and describe 500 "benchmark jobs" across the company through the completion of position assessment questionnaires by Deere management.

18

App. 566–67 [Sperling dep. p. 68:21-69:7; 72:3-9)]. Once identified, these benchmark jobs were sent to a Deere functional review committee for input. App. 559 [Sperling dep. p. 39:17]. The functional review committee was made up of "people within the functions who had broad and deep knowledge of the work being done in the function, the work being done in the jobs, and the work being done by various people." App. 559 [Sperling dep. 39:21-40:1]. Once the functional review committee had provided its input, positions could be ranked in order of importance to the company, based on a three-factor analysis: Know-how, problem solving, and accountability. App. 1094. This would be used by human resources to create a benchmark list. App. 1161–73. Each manager would then work with the unit's human resources representative to map his or her subordinates to those job descriptions. App. 1084 [Sperling dep. p. 142:12-23]. If an employee's work was an 80 percent match to a benchmark job, that employee was to be placed in the benchmark job that matched. App. 1088–89 [Friend dep. p. 24-25].

In mapping employees to benchmark positions, managers were to be provided with job descriptions that did not include grades. App. 1083 [Sperling dep. p. 141:3-6]. In fact, a directive from upper management specifically prohibited human resources representatives from disclosing any

19

grades to managers. App. 1082 [Sperling dep. p. 86:2-19]. Only after mapping was complete would actual job grades be disclosed to managers and employees. In theory, GJE would create a blind system that placed employees doing substantially the same work in the same job at the same grade company-wide.

In practice, GJE was a management-driven system that left human resources fully dependent on those managers for necessary information, that allowed management to set its own standards for "mapping" without consequence, and that only further allowed the Defendants to discriminate against Sellers while simultaneously providing them a smokescreen of objectivity. Even where managers found an 80 percent match between an employee's position and a benchmark job, they were allowed to create "overriding factors" known only to them as a way to differentiate employees. Human resources representatives, who were supposed to provide a check and balance to managers in the mapping process, were instead wholly dependent on management for information on how employees were mapped and provided no check on the power of management to place employees at whim. Even if managers were not given the absolute grades for their employees at the time mapping was done – a dubious claim, given that D'Cruz knew those grades months in advance –

20

they could easily deduce the relative grade of similar benchmark jobs based on the language of the description.  App. 1083–84 [Sperling dep. p. 141:7-142:1].

**D'Cruz favored younger employees over older employees and stated obvious discriminatory intent.**

The clear discriminatory impact of the GJE implementation in supply management could be coincidental if it had not been orchestrated by Clyde D'Cruz.  D'Cruz repeatedly made statements exhibiting his intent to eliminate or marginalize older employees, and made decisions that were meant to do precisely what he intended.

D'Cruz's preference for younger employees was evident to those in supply management.  Richard Brammer, who was moved laterally from PDP to OFP to make room for Rachelle Beuter's promotion in 2004, testified that young employees were "on a fast track" while older employees "stayed stagnant."  App. 1092 [Brammer dep. p. 21:12-22:3].  Michael Grady, a quality engineer who worked in supply management before retiring from Deere in 2005, states that D'Cruz promoted young employees more rapidly than older employees.  App. 1146–47.

D'Cruz's disinterest in, and hostility toward, older employees also became evident to Deere human resources soon after GJE had been

21

implemented. In spring 2004, Deere proposed that "Mel," a 53-year-old engineer from Des Moines Works who was interested in moving to Waterloo Works, be placed in supply management. App. 1130. Mel graduated from the University of Illinois in 1973 with an agricultural engineering degree, was 53 years old, and had been with Deere long enough to accumulate 77 retirement points. App. 1130. (Kevin Keith was unable to explain why Mel's age was a point of discussion as he agreed it was an inappropriate factor to even discuss related to a hiring determination.) D'Cruz's reaction to the request, an apparent email which has curiously not been provided in discovery by Deere, prompted a long email response from Waterloo human resources director Kevin Keith and a half-hour meeting the following day. App. 1130. From the context of Keith's response, it is clear that D'Cruz was not receptive to the request to hire Mel, and pressed for information on Mel's versatility and long-term future with the company. App. 1130. Keith responded that Mel could "provide stability and experience to some of your numerous younger people." App. 1130. D'Cruz also apparently questioned the wisdom of paying for relocation expenses for a 53-year-old employee, drawing this response from Keith:

> As for paying the relocation expense, again I would offer that he's probably not planning to retire soon. **And I would caution you in using a broad brush in painting people like**

22

**him as being not worth investing in or that they carry
'baggage.'** If Mel did not have energy and something left in
his tank, why would he be requesting a move like this? **Your
view also creates risk for the company from an age
discrimination standpoint which I know you do not want.** I
can talk with you more on that.

App. 1130 (emphasis added). D'Cruz's comments mirror those previously
heard by Mike Sellers.

### D'Cruz refuses to accommodate Sellers' disability

After the audit problem, Mike requested that any change in
responsibilities or goals be put in writing, so that he could keep track of the
changes. App. 536 [Sellers dep. p. 360:19-25]. He requested this because
he was having short-term memory lapses due to his depression, anxiety, and
post-traumatic stress disorder. App. 536 [Sellers dep. p. 360:25-361:2].
D'Cruz refused, saying it was "not a good use of his time." App. 537
[Sellers dep. p. 361:1-2].

### Mike files a complaint, treats for his psychological issues, and leaves Deere on long-term disability

On March 31, 2005, Mike filed an internal complaint with human
resources alleging active age and disability discrimination. App. 1170
[Sellers dep. p. 365:12-366:17]; 1451. He filed a complaint against John

23

Deere Waterloo Works with the Iowa Civil Rights Commission and EEOC on or about April 22, 2005, alleging age discrimination, disability discrimination, and retaliation. App. 1157–58.

In late 2004, after over a year without treatment for his depression, Mike was again forced into mental health treatment. In a November 24, 2004 visit to Dr. Harding at Black Hawk-Grundy Mental Health, Mike presented with an acute stress reaction to his work environment, stemming from unfairly low performance ratings. App. 1485–86. His treatment records chronicle his mistreatment from Deere: Work performed effectively is downgraded. App. 1485. Goals are vague, leading to negative feedback from supervisors App. 1486. Supervisors complain that he isn't busy enough even though he is doing the work of two or three employees. App. 1487.

By January 26, 2005, Sellers was suffering from acute stress disorder with depression and suicidal ideation. App. 1488. Dr. Harding makes a formal diagnosis of post-traumatic stress disorder and says that his ability to function is "significantly diminished." App. 1488. There were "serious changes" from his condition in 2005. App. 1489–90. The PTSD also led to a bout of problem gambling, as an escape from the thoughts of what had happened to him at Deere; this led to treatment with therapist Jewel Cooper in 2008. App. 1493–95.

24

On March 1, 2005, he was placed on medical leave. App. 1491–92. One year later, he transferred to long term disability. App. 1180–81.

**Mike's current problems as a result of Deere's discriminatory acts**

Mike still suffers from symptoms of post-traumatic stress disorder. App. 1063 [Sellers dep. p. 10:21-11:18]. Anything that reminds him of his former work environment, from phone calls to multiple people talking at the same time, can trigger his PTSD. App. 1063 [Sellers dep. p. 10:23-11:1]. Having multiple people in the room at once eventually puts him in a "brain fog" where he cannot understand what is happening around him. App. 1063 [Sellers dep. p. 11:2-9]. Loud noises, yelling, screaming, slamming doors, or pounding on a table can also trigger his PTSD. App. 1063 [Sellers dep. p. 10-18]. He takes anxiety medications, such as hydroxyzine and Zoloft. App. 1062 [Sellers dep. p. 7:24-8:1]. He is on the maximum dosage of Zoloft. App. 1062 [Sellers dep. p. 8:16].

**Sellers files and settles a workers' compensation claim against Deere**

Sellers settled a workers' compensation claim against Deere in 2008. App. 1496–97; 1503–4. The settlement specifically covered only his rights under Chapter 85 of the Code of Iowa, and his rights to pursue his EEOC

25

case were preserved specifically and completely. App. 1496–97; 1503–4.

Deere agreed to these terms. App. 1496–97; 1503–4.

### 3. Rulings Presented for Review

(a) Whether the District Court erred in determining as a matter of law Plaintiff did not have direct evidence of age discrimination in violation of the Age Discrimination in Employment Act, 29 U.S.C. § 623(a)(1), and Iowa Civil Rights Act, Iowa Code § 216.6(1)(a). App. 1625.

(b) Whether the District Court erred in determining as a matter of law that Plaintiff had not suffered an adverse employment action under the Age Discrimination in Employment Act, 29 U.S.C. § 623(a)(1), and Iowa Civil Rights Act, Iowa Code § 216.6(1)(a). App. 1629.

(c) Whether the District Court erred in determining as a matter of law Plaintiff did not suffer from a "disability" under the Americans with Disabilities Act, 42 U.S.C. § 12102(1)(A). App. 1632.

(d) Whether the District Court erred in determining as a matter of law Plaintiff did not engage in any statutorily protected conduct under the Age Discrimination in Employment Act, 29 U.S.C. § 623(d), and Iowa Civil Rights Act, Iowa Code § 216.11(2). App. 1634.

26

(e) Whether the District Court erred in determining as a matter of law Plaintiff had not suffered an adverse employment action under the Age Discrimination in Employment Act, 29 U.S.C. § 623(d), and Iowa Civil Rights Act, Iowa Code § 216.11(2). App. 1635.

(f) Whether the District Court erred in determining there is no genuine issue of material fact regarding his hostile work environment claim under the Age Discrimination in Employment Act, 29 U.S.C. §§ 623(a)(1), 623(d), the Americans with Disability Act, 42 U.S.C. § 12102(1)(A), and Iowa Civil Rights Act, Iowa Code §§ 216.6(1)(a), 216.11(2). App. 1638.

Appellate Case: 14-2244    Page: 39    Date Filed: 07/21/2014 Entry ID: 4177255

## SUMMARY OF THE ARGUMENT

The District Court erred by granting Defendants' Motion for Summary Judgment on a number of grounds.

First, the Court determined that Sellers did not produce direct evidence, and, as a result, applied the *McDonnell-Douglas* framework. In its determination, it found that there was not a specific link between the discriminatory animus and the challenged decision. Sellers produced evidence that Defendant, Clyde D'Cruz, had a strong discriminatory animus against older employees <u>and</u> that he specifically stated his intentions to eliminate older employees from the department. D'Cruz's stated intentions were acted upon within the department as a whole and Sellers was one of many victims of this. Because this is a nexus between D'Cruz's specific statements and Sellers' adverse employment actions taken against him by D'Cruz, the District Court erred by finding Sellers produced no direct evidence, and thus, erred in applying the *McDonnell-Douglas* framework.

Next, the Court erred in its determination that Sellers had not suffered an adverse employment action and, as a result, could not establish a *prima facie* case of age discrimination. In making this determination, the Court inappropriately weighed evidence, as well as made factual and credibility determinations that are meant to be decided by a jury. The evidence, taken

28

in the light most favorable to Sellers, clearly shows that he suffered tangible changes in his working conditions that produced material disadvantages including (1) being stripped of future promotional opportunities and (2) receiving a significant increase in workload that amounted to a tangible change in conditions.

The District Court also erred in its determination that Sellers did not suffer from a "disability" as defined by the ADA. Sellers suffered from depression and post-traumatic stress disorder. His disability affected major life activities through his significant inability to focus, read, write, and concentrate. The District Court's reliance on Sellers' own lay testimony that he was not "disabled" until he took medical leave is an inappropriate determining factor for the legal term "disability."

Sellers engaged in statutorily protected activity by outwardly opposing D'Cruz's discriminatory actions against older employees. The aforementioned adverse actions occurred following his opposition and can be attributed to D'Cruz's discrimination or retaliation against Sellers.

Finally, the District Court erred in its determination that Sellers did not suffer from a hostile work environment. Again, the District Court failed to view the evidence in the light most favorable to Sellers. It focuses on one of many factors—frequency—to determine that Sellers' claim does not rise

29

to the appropriate standard. However, there are many other factors that the Court must consider. Furthermore, there are a number of material factual issues that exist related to Sellers' claim for a hostile work environment that must be determined by a jury.

## ARGUMENT

### I.    Scope of Review

A District Court's grant of summary judgment is reviewed de novo, viewing the facts in the light most favorable to the non-moving party and giving him the benefit of all reasonable inferences. *Butler v. Crittenden County*, 708 F.3d 1044, 1048 (8th Cir. 2013). The Court of Appeals may affirm only if there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Id.* at 1049.

### II.    Legal Standard for Summary Judgment

Summary judgment is appropriate only if the record shows "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. Fed. R. Civ. Pr. 56(c); *Rakes v. Life Investors Ins. Co. of America*, 582 F.3d 886, 893 (8th Cir. 2009). A fact is material "if its resolution affects the outcome of the case." *Id.* (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91

L.Ed.2d 202 (1986)). **The Court must view the record in the light most favorable to the nonmoving party and afford it all reasonable inferences**. *Baer Gallery, Inc. v. Citizen's Scholarship Foundation of America, Inc.*, 450 F.3d 816, 820 (8th Cir. 2006) (emphasis added) (citing *Drake ex rel. Cotton v. Koss*, 445 F.3d 1038, 1042 (8th Cir. 2006)).

In entertaining a motion for summary judgment, "the Court must draw all reasonable inferences in favor of the nonmoving party, and it may not take credibility determinations or weigh evidence. *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 150 (2000); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) ("The evidence of a non-movant is to be believed and all justifiable inferences are to be drawn in his favor." (citation omitted)). **"Credibility determinations, the weighing of evidence, and the drawing of legitimate inferences from the facts are jury functions, not that of a judge."** *Id.* (quoting *Anderson*, 477 U.S. at 255) (emphasis added).

"Rather, the Court's function is to determine whether a dispute about a material fact is genuine, that is, whether a reasonable jury could return a verdict for the nonmoving party based on the evidence." *Quick v. Donaldson Co., Inc.*, 90 F.3d 1372, 1377 (8th Cir. 1996). "'If reasonable

31

minds could differ as to the import of the evidence,' summary judgment is inappropriate." *Id.* (quoting *Anderson*, 477 U.S. at 250).

Summary judgment is disfavored in employment discrimination cases because such cases are "inherently fact-based." *Simpson v. Des Moines Water Works*, 425 F.3d 538, 542 (8th Cir. 2003) ("'Summary judgment should seldom be granted in the context of employment actions, as such actions are inherently fact based.'") (quoting *Keathley v. Ameritech Corp.*, 187 F.3d 915, 919 (8th Cir. 1999)); *see also Pye v. Nu Aire, Inc.*, 641 F.3d 1011, 1018 (8th Cir. 2011) (holding that although employment discrimination cases are "not immune from summary judgment," they are "often fact intensive and dependent on nuance in the workplace." (citation omitted)). In an employment discrimination case, summary judgment should only be granted "if the evidence could not support any reasonable inference of discrimination." *Elnashar v. Speedway SuperAmerica, LLC*, 484 F.3d 1046, 1055 (8th Cir. 2007) (emphasis added).

Following the Trilogy of cases in 1986[1], summary judgment has morphed into a form of docket control and is being "stretched far beyond its originally intended or proper limits." Patricia M.Wald, *Summary Judgment*

---

[1] *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

32

*at Sixty*, 76 Tex. L. Rev. 1897, 1941 (1998) ("Its flame lit by *Matsushita*, *Anderson*, and *Celotex* in 1986, and fueled by overloaded dockets of the last two decades, summary judgment has spread swiftly through the underbrush of undesirable cases, taking down some healthy trees as it goes."). This trend has gone much too far and is eliminating litigants' right of trial by jury.[2] **The instant case is a prime example of such—this case is dripping in fact issues and nuances, and turns on the <u>intent</u> of individuals involved—<u>all of which must be determined by a jury</u>**. The United States Supreme Court certainly did not intend to transform the application of Rule 56 by the Trilogy as what is occurring in actual practice, and the Eighth Circuit should "save" this "healthy tree" and recognize the fact issues that must be decided by a jury and are not appropriate for summary judgment.

**III. <u>Sellers presented direct evidence of discrimination.</u>**

The District Court erred by determining Sellers did not present direct evidence of discrimination. The Eighth Circuit has held that a comment by a

---

[2] *See* Milton I. Shadur, *From the Bench: Trial or Tribulations (Rule 56 Style)?*, Litig., Winter 2003, at 5, 5 ("When the close-of-discovery bell rings, the Rule 56 dog salivates. That almost instinctive response seems to be particularly marked in employment discrimination cases, with active encouragement of most Courts . . ."); Mark W. Bennett, *Essay: From the "No Spittin', No Cussin' and No Summary Judgment" Days of Employment Discrimination Litigation to the "Defendant's Summary Judgment Affirmed Without Comment" Days: One Judge's Four-Decade Perspective*, 57 N.Y.L. Sch. L. Rev. 685 (2012–2013).

33

decision-maker must show a "specific link of discriminatory bias and the adverse employment action," sufficient to support a finding by a reasonable fact-finder that the bias motivated the action. *Torgerson v. City of Rochester*, 643 F.3d 1031, 1045–46 (8th Cir. 2011); *see McCullough v. Univ. of Ark. For Med. Scis.*, 559 F.3d 855, 860–61 (8th Cir. 2009); *cf. Simmon v. New Pub. Sch. Dist. No. Eight*, 251 F.3d 1210, 1213, 1214 (8th Cir. 2001) (school board president's statements that a "woman can't handle [the administrator's] job" and that the employee was "a woman in a man's job" are direct evidence of sex discrimination); *Stacks v. Southwestern Bell Yellow Pages, Inc.*, 27 F.3d 1316, 1318, 1324 (8th Cir. 1994) (supervisor's comment that "women in sales were the worst thing" to happen to the company is direct evidence of sex discrimination).

The District Court determined there was not a specific link between the discriminatory animus exhibited by D'Cruz and any adverse decisional process against Sellers. App. 1625. The Court did not expand on how it came to this conclusion, but rather made the blanket conclusion that there was no link. *See id.*

When looking more carefully at the evidence presented and the statements made by D'Cruz, a specific link between his comments and his actions against Sellers, as well as the actions against the department as a

34

whole, becomes glaring. D'Cruz clearly had a plan from the start, and he

shared this with Sellers: "we need to get these old farts out of here." This

was not an isolated comment; D'Cruz repeated this mantra to Sellers at least

5-10 times. App. 496 [Sellers dep. p. 24:4–12]. He did not even stop there:

- D'Cruz described the planners in his department as "sheep that can be slaughtered." App. 496 [Sellers dep. p. 24: 16–21]. While it is not alleged D'Cruz intended to murder anyone, his the metaphorical use of this term reflected his plan of eliminating these employees by some means – a direct connection between his comments and actions.
- John Deere performed an internal audit—the WWCA audit—that revealed D'Cruz's department had severe problems as a result of too many younger employees with little experience being moved into positions replacing older employees. This audit—and the findings discovered by Sellers as the individual assigned to address the audit— reveal D'Cruz was acting on his words. App. 1174–75; 1496–98.
- Sellers recommended D'Cruz remediate the WWCA audit results by placing older employees back into key positions bringing experience back into the department and he said "that was not going to happen." App.1496–98.
- D'Cruz announced at a departmental meeting his plan to get rid of the older employees, comparing them to "old dogs." App. 497 [Sellers dep. p. 25: 6–11].
- D'Cruz is warned by the Human Resources manager, Kevin Keith, that his "viewpoint" puts the company at risk for age discrimination. Keith cautions him not to broad brush older employees as having "too much baggage" and not enough "gas left in the tank." App. 1130. This is in response to a mysteriously unavailable email from D'Cruz that apparently expressed his strong resistance to hiring a 53-year old into his department due to his age.

The comments and actions made by D'Cruz reflecting his

discriminatory animus against older employees is not limited to isolated

commentary. In fact, it is not even limited to commentary; D'Cruz

35

clearly <u>acted</u> on his expressed intent to "get rid of the old farts." He did it systematically behind the guise of his own "reorganizations," as well as through the company-wide GJE. Once D'Cruz realized Sellers was an "old fart" himself, Sellers became a target of D'Cruz's scheme to weed him out of the department as well. As a result, a "specific link" exists between D'Cruz's explicit discriminatory animus and his decision to "get the old farts" out of the department: he stated his intent to systematically remove "old farts" from his department, he did so by various means of reorganizations that stripped older employees of future promotional opportunities, and Sellers was one of many of these victims. The fact that the "nexus" involved an entire department and Sellers was one of many who suffered as a result of D'Cruz's scheme does not preclude the Court from recognizing this evidence as direct.

The District Court does not provide any explanation as to how a "specific link" is missing in this case. Yet, based on the facts viewed in the light most favorable to Sellers, it appears the District Court is applying a "direct evidence" standard that is so drastically narrow, it renders it inaccessible except for the bluntest of admissions. While "direct evidence" is a rigorous standard, the District Court's application was such that made it not only rigorous, but insurmountable.

36

Other circuits have agreed the standard for direct evidence should not be so drastic as to make it impossible. *See Patten v. Wal-Mart Stores East, Inc.*, 300 F.3d 21, 25 (1st Cir. 2002) (recognizing the standard is not insurmountable); *Febres v. Challenger Caribbean Corp.*, 214 F.3d 57, 61 (1st Cir. 2000) ("The mere fact that a fertile mind can conjure up some innocent explanation for such a comment does not undermine its standing as direct evidence. To hold otherwise would be to narrow the definition of direct evidence so drastically as to render the *Price Waterhouse* framework inaccessible to all but the bluntest of admissions. We prefer a more measured approach." (internal citations omitted)); *Jones v. Robinson Prop. Group, L.P.*, 427 F.3d 987, 992 (5th Cir. 2005) ("We have previously held that 'statements or documents which show on its face that an improper criterion served as a basis—not necessarily the sole basis, but a basis—for the adverse employment action are direct evidence of discrimination."); *Causey v. Sewell Cadillac-Chevrolet, Inc.*, 394 F.3d 285, 290 (5th Cir. 2004) ("When a person or persons with decision making authority evinces racial animus that may constitute direct evidence of discrimination."); *DiCarlo v. Potter*, 358 F.3d 408, 415 (6th Cir. 2004) (". . . direct evidence does not require a factfinder to draw any inferences in order to conclude that the challenged employment

37

action was motivated at least in part by prejudice against members of the protected group" (internal citations omitted); "[T]he evidence must establish not only that the plaintiff's employer was predisposed to discriminate [. . .] but also that the employer acted on that predisposition.").

There is no dispute D'Cruz was a decision maker. There should be no dispute, taking the evidence in the light most favorable to Sellers, D'Cruz expressed a strong animus against older employees. There should be no dispute, taking the evidence in the light most favorable to Sellers, D'Cruz made numerous comments relating to his desire to remove members of a protected party from his department—"old farts" or "sheep that can be slaughtered" as D'Cruz prefers to call these individuals. These comments were not simply calling older employees names; they were statements describing his plan of eliminating them from his department. While he took on a variety of methods in which to follow through with his comments, this is the precise complained-of employment decision in this matter, and thus a nexus between the comments and the action exist. As a result, the District Court erred by failing to recognize direct evidence had been presented in this matter.

38

## IV. **The District Court erred in determining that Sellers failed to establish an adverse employment action**.

Upon review of the District Court's grant of summary judgment, including its version of the "relevant facts," it becomes clear the Court not only refused to view the evidence in the light most favorable to the non-moving party, as required under the law, but it went so far as to weigh evidence and completely ignore crucial facts in Plaintiff's favor. The result amounted to a ruling by the District Court draped in bias in favor of the Defendant; in effect, this case was a <u>trial by paper</u>. This is not the purpose of Rule 56(c), it is not the proper role of the judge in determining a motion for summary judgment, and is certainly not in accord with the law. Upon review of the evidence *de novo*, this Court will find, when viewing the evidence in the light most favorable to Sellers and giving him all reasonable inferences that he did in fact suffer an adverse employment action, and that issues of material fact exist in relation to this adverse employment action that must be decided by a jury.

The Court's allegation that it is "unclear" what adverse employment action Sellers is asserting is both inconsistent with the record on the issue and simply an inappropriate play on semantics—not an analysis of the evidence in the light most favorable to the non-moving party. App. 1626.

39

The evidence in this case speaks for itself and the Court chose, instead, to turn a deaf ear.

In its ruling, the Court took the time to applaud Defendants for "devot[ing] ten pages of their brief to rebutting a claim of alleged adverse employment action, responding to allegations found in Sellers' response to Interrogatory No. 22." App. 1626. By doing so, the Court could not be more explicit in its weighing of the evidence in this regard; literally weighing the evidence by championing Defendants' use of ten pages of briefing on the point as being stronger than Sellers' briefing on the issue which is more concise. App. 1626–27. The stage of summary judgment is not the time for the Court to determine which evidence is stronger. Rather, the only task for the Court at this stage is to determine whether a dispute about a material fact issue is genuine. *Quick*, 90 F.3d at 1377 ("[T]he Court's function is to determine whether a dispute about a material fact is genuine, that is, whether a reasonable jury could return a verdict for the nonmoving party based on the evidence."). If anything, the counting-the-pages technique should weigh in Sellers' favor that clearly material fact issues exist and summary judgment is inappropriate based on the amount of argument Defendants were required to make in an attempt to "rebut" it.

40

### a. **Global Jobs Evaluation was the tool utilized to effectively demote Sellers.**

In its analysis, the first glaring issue with the District Court's erroneous determination that Sellers did not suffer an adverse employment action is its seeming inability to recognize the role GJE played in facilitating Sellers' adverse employment action. In fact, the Court does not mention the role of GJE as it relates to Sellers' adverse employment action **once** in its analysis of the issue. In doing so, the Court errs by refusing to recognize or consider or analyze Sellers' failure to promote **through the implementation of GJE** at the hands of D'Cruz.[3] There is no logical way to analyze the adverse employment action without mentioning GJE; the Court's failure to do so is a clear indication of its error.

This case does not involve the traditional "failure to promote" set of facts: there was no job posting, application, and selection of candidates from a job pool. However, the fact that Sellers' adverse action does not fit squarely into a traditional definition does not eliminate Sellers' ability to satisfy this prong of the *prima facie* case. As with most high level managers

---

[3] The adverse action suffered by Sellers could reasonably be coined a failure to promote, a demotion, or a "change in employment that significantly affect[s] an employee's future career prospects"; each of these events meet the standard for an adverse employment action under the law. *See Jackman v. Fifth Judicial Dist. Dept. of Correctional Services*, 728 F.3d 800, 804 (8th Cir. 2013).

41

who intend to unlawfully discriminate against older employees, D'Cruz

attempted to be subtle; instead of terminating the protected employees, he

utilized a company-wide reorganization— GJE—to further his ongoing

scheme to eliminate the "old farts" from his department. However, D'Cruz

slipped up when he let Sellers know about his plan early on in his tenure at

John Deere while Sellers was still his "right-hand man."[4] Once D'Cruz

realized Sellers was also an "old fart," he became another one of the victims.

In Sellers' case, the result of GJE created a tangible change in

working conditions that significantly affected his future career prospects.

*Spears v. Missouri Dept. of Correction and Human Resources*, 210 F.3d

850, 853 (8th Cir. 2000) ("Termination, reduction in pay or benefits, and

changes in employment that significantly affect an employee's future career

prospects meets this standard" of an adverse employment action). Sellers

describes these events as resulting in a failure to promote—or an effective

demotion—by and through the GJE results. Simply because the Court

cannot fit Sellers' facts into a convenient definition of failure to promote

does not mean he did not suffer from an adverse employment action; in

---

[4] App. 496 [Sellers dep p. 24:4–12] (Sellers personally heard D'Cruz state comments such as "we need to get these old farts out of here" 5–10 times); App. 497 [Sellers dep. p. 24: 12–15] (describing older employees as having "way too much baggage" and "no good for us"); App. 497 [Sellers dep. p. 25: 6–11] (stating his intention to "getting the old dogs out of here").

42

contrast, it is the intricacies of GJE related to this adverse action that

preclude summary judgment in this matter due to the number of material fact

issues that should be determined by the jury.

      i.   The District Court refuses to view the evidence related to GJE

          in the light most favorable to Plaintiff.

In reviewing the Court's "relevant facts" related to GJE, it is no

surprise it chose to ignore this crucial portion of the facts as they related to

the adverse employment action since its description of GJE is portrayed

entirely in the light most favorable to Defendants. In fact, the Court went

even further and refused to recognize <u>any</u> inferences in favor of Sellers as it

should have done:

> **The Court has reviewed Sellers' statement of contested
> facts, however, and can find <u>no evidence</u> supporting his
> claim that D'Cruz "campaigned" to move younger and
> male employees into positions which would score higher on
> the GJE.**

App. 1614 (emphasis added). It is true and Sellers concedes that there is not

any evidence in the record of D'Cruz endorsing his views with posters or

fliers or commercials on the subject as one may traditionally expect a

"campaign" to include. However, the Court's far-reaching statement

blatantly ignores the actions of D'Cruz and the reasonable inferences that

must be taken from this evidence in favor of Sellers:

43

- D'Cruz personally informed Sellers that he wanted "to get the old farts" out of the department at least 5-10 times. App. 496 [Sellers dep p. 24:4–12].

- John Deere's own internal WWCA audit revealed there were too many young people in the department under D'Cruz's leadership which revealed D'Cruz's words were quickly becoming action. This was consistent with D'Cruz's self-led "reorganizations" that commonly occurred in his department which allowed him to shift older employees into less desirable positions under the guise of a business decision. App. 1174–75, 1496–98.

- Sellers requested to move "older buyers" with more experience back into critical positions in response to the WWCA audit but D'Cruz responded "that was not going to happen." App. 1496–98.

- D'Cruz had knowledge of which job positions would have higher grades under GJE, even if he did not know the specific grades, and arranged his department to upgrade his younger employees and either downgrade his older employees OR place the older employees in jobs that lacked promotional opportunity. *See* App. 1083–84 [Sperling dep. p. 141: 7–142]. Sellers was just one example of this.

44

- A warning was given to D'Cruz from Human Resource manager,
  Kevin Keith, that his "viewpoint" was putting the company at risk for
  age discrimination, reminding D'Cruz that it was dangerous to brush
  (older) employees with a broad brush as having no gas left in the tank
  and too much baggage.[5] App. 1130. This warning occurred at a
  temporally significant time period, in the midst of the GJE
  implementation and simultaneous to the adverse actions occurring
  against Sellers.
- D'Cruz had the ability in his position to "map" employees to job
  positions and in fact this was his role in the GJE process, giving him
  the power to follow through with his voiced intention. App. 1084
  [Sperling dep. p. 142: 12–23].

The results of GJE show that D'Cruz followed through with his plan by
Sellers' mapping to a dead end job.

Since the District Court is not allowed to weigh evidence or determine
Sellers' credibility, it must assume the statements made by D'Cruz about

---

[5] It should be noted that the District Court failed to include any mention in its
relevant facts about this email correspondence wherein John Deere's own
human resources department expressed its concern for D'Cruz's
discriminatory viewpoints. It also failed to include any explanation as to
why it did not find these documents worthy of inclusion when it occurred at
a temporally significant time period and speaks directly to the Defendant's
animus toward older employees.

45

older employees did in fact occur; it must assume that the WWCA audit was the result of moving too many younger people into positions they were underqualified for and moving older employees out of those positions to less desirable jobs at D'Cruz's direction; and it must assume that D'Cruz had the ability to map employees into job positions under GJE.

ii. The inaccurate mapping of Sellers through GJE is the adverse employment action, and Defendants' characterization of this as a "misunderstanding" is simply a red herring.

The Court's failure to understand—or refusal to recognize—GJE's role in adversely affecting Sellers' employment continues in the Court's inability to recognize the significance of Sellers' mapping under the GJE which was performed by D'Cruz. Despite the "extensive analysis and reviews" that the Court points out were performed within the GJE system—which, in practice, was actually manager-dominated and controlled—somehow Sellers was mapped to a position in which the job description did not match his actual job duties in any shape or form. App. 861. The GJE process, which the Court points out is "described in detail" by Defendants admits that employees were supposed to be mapped to positions that were an 80% match to the work they performed. App. 1088–89 [Friend dep. p. 24–25].

46

Yet, this is clearly not true for Sellers. He was not performing any Supply Management Specialist III job duties, let alone 80%.

The Court points to Defendants' response that Sellers' interpretation of his "mapping" was a "misunderstanding" and Sellers was, in fact, working as a Process Pro. Defendants' attempt to argue in circles is simply a red herring. First, **the GJE job title is important**—hence the arduous years of implementation performed by John Deere to implement the new job titles into the company. The job title is linked to a job description which provides the duties the employee is expected to perform, <u>as well as the associated grade level which equates to pay</u>. *See* App. 327 (job titles describe the nature of the work performed by the employee). Yet, the Supply Management Specialist III did not include any of the work that was being performed by Sellers as a Process Pro for the previous three years.

Next, it is not "just" a title.[6] The GJE job title "Process Pro" was in fact a job title under the GJE and had a number of grade (or pay) levels well beyond where Sellers was performing during the implementation of GJE[7],

---

[6] The Court should notice the <u>significant</u> amount of time John Deere expends building up the GJE process, implementation and its credibility in its defense. Then, in the blink of the eye, the GJE job titles that were the result of this process become "just" titles when it becomes convenient and Defendants hope this glaring material factual issue is ignored.

[7] John Deere's own GJE document describes Sellers' job as "Process Pro" as being similar work to "other 'Process Pro II's'". App. 15295.

providing many future promotional opportunities for him in this career path. In fact, Daria Jerauld was, at one time, one of those higher level process pro's herself. App. 171 [Jerauld dep. p. 14]. Further, D'Cruz himself admitted there were "quite a few" process pro's at John Deere. App. 161.

Finally, Defendants' response to this issue provides no true explanation as to why Sellers was mapped to a position in which he was not an 80% match; rather, it simply points to Sellers' own argument that he was in fact performing the Process Pro position. Sellers agrees with this fact. This is the very problem: the job title dictating grade and pay did not match the work performed. The fact that Sellers' grade level was the same before and after GJE implementation is irrelevant to Sellers' adverse employment action. The fact remains that the Process Pro job family had many more promotional levels—beyond Labor Grade 7—that the Supply Management Specialist position did not. When questioned why Sellers was mapped to this position that did not match his work, D'Cruz—the individual who performed the mapping—could not provide a satisfactory or confident explanation. App. 156 [D'Cruz dep. p. 158] (claiming the map was due to who he was reporting to, not the content of his work—directly contradicting the entire GJE process). Defendants own inability to provide an explanation only produces additional material fact issues that must be determined by a

48

jury. Defendants own inability to provide an explanation strengthens Sellers'
argument that the GJE procedure was not implemented as John Deere claims
it was and was able to be manipulated at the hands of managers, such as
D'Cruz, as he did here—just another of the <u>many</u> material fact issues that
must be determined by a jury.

Defendants attempt to distract the Court by claiming GJE is Sellers'
argument for pretext only. This is patently false. The Court cannot
appropriately analyze whether Sellers suffered an adverse employment
action without considering the very tool that was used in order to implement
the adverse employment action: GJE. D'Cruz utilized many of his own
"reorganizations" in order to achieve the results he sought out: to eliminate
the older employees in his department. Then, GJE came along which gave
him an additional, and arguably stronger, guise of a "reorganization" in
which to further his scheme. Without considering this entire picture, the
Court is failing to view the evidence in the light most favorable to Sellers.
Further, the layers of facts and nuances involved in D'Cruz's scheme, the
GJE process, the GJE implementation, and Sellers' own inaccurate mapping
create an abundance of factual issues related to whether Sellers suffered an
adverse employment action that are material and genuine and must be left
for a jury to decide.

49

**b. Sellers was overworked far beyond the duties of his position as a "Process Pro" creating tangible changes in working conditions, including the hours he worked and the duties performed.**

Once again, a review of the District Court's "revelant facts" as it relates to Sellers' workload reveals a bias in favor of the Defendants' version of the facts, failing to view the evidence in the light most favorable to Sellers. App. 1618. The best evidence of Sellers' day-to-day duties is Sellers himself. The best evidence of Sellers' workload and the amount of time it took him to complete his work is Sellers himself. The Court must accept Sellers' personal account of the events related to his work duties and workload as true for the purposes of summary judgment. Sellers' recollection of the facts are based on personal observations and come in the form of sworn testimony; to not accept Sellers' facts would involve a credibility determination by the Court of Sellers which is inappropriate at summary judgment. Despite this, the Court chose to view Sellers' job duties in the light most favorable to the Defendants and ignore altogether Sellers' evidence.

Furthermore, the Court's characterization that Sellers' workload was just a part of his position as Process Pro is without support from John Deere's

own witnesses. D'Cruz admitted he did not know what work was assigned to Sellers by Jerauld. App. 162 [D'Cruz dep p. 222]. Jerauld admitted much of the work Sellers testified he performed was not within his job duties as a Process Pro. App. 178–79 [Jerauld dep. p. 88, 90]. In fact, the two managers responsible for Sellers' workload both just point fingers at the other as to who knew what Sellers' job consisted of. App. 162 [D'Cruz dep. p. 34]; 176 [Jerauld dep. p. 52]. Jerauld also admitted she was not aware of any and all ad hoc requests Sellers took care of in addition to those she assigned him. App. 180 [Jerauld dep. p. 93].

Since the Court may not determine Sellers' credibility, his personal, first-hand account of his work duties, hours, and conditions must be considered true. Even considering John Deere's evidence related to this, the Court is still required to make all reasonable inferences in favor of Sellers. Instead, the Court blatantly ignores these facts in describing Sellers' complaints of being overworked as simply being part of his job as Process Pro. App. 1628. Further, if there is a dispute as to whether some of Sellers' duties were a part of his job description as alleged by John Deere, this creates a genuine issue of material fact in relation to Sellers' adverse employment action that is appropriate for the jury, not for the judge.

51

Sellers has described his workload as increasing during the term in question to amount to the work of three to four full time positions. This work included:

(1) Taking over Trudy Baird's desk during her extended medical leave. Baird was a full time employee and her job of ordering hot parts for the line was necessary and important or the line would shut down. App. 178 [Jerauld dep. p. 85].

(2) Taking over planner duties of Emily Delagardelle after her departure. Jerauld admits she cannot dispute Sellers' testimony he performed this work and admits these planner duties were not a part of his job as Process Pro. App. 178 [Jerauld dep. p. 85].

(3) Supported the pilot and development of enterprise wide capability planning. Jerauld also admitted this work was not a part of his duties as Process Pro. App. 179 [Jerauld dep. p. 90].

These jobs were in addition to his actual job duties. The amount of time Sellers committed to his work week-by-week was indicative of this workload. App. 1311–12. Thus, it is no surprise he was unable to keep up and failed to perform some of his duties to satisfaction. As a direct result, Sellers was stripped of his supervisory duties which disqualified him from a

52

higher level of Process Pro under the hierarchy established by the GJE job descriptions. App. 533 [Sellers dep. p. 348].

Three to four full time positions is not "the job Sellers signed up for" as the Court describes. App. 1628. And, in light of covering everyone else's position, Sellers' "regular" duties under Jerauld only grew. As a result, the continuously increasing and unmanageable job duties amounted to a tangible change in working conditions.

The District Court compares Sellers' complaint of a change in duties resulting in an unmanageable workload with two previous Eighth Circuit cases, *Wilkie v. Department of Health and Human Services*, 638 F.3d 944 (8th Cir. 2011) and *Sallis v. University of Minnesota*, 408 F.3d 470 (8th Cir 2005). In both of these cases, the Eighth Circuit determined the changes in working conditions were too minor to qualify as an adverse employment action. Yet, upon review of these cases, the changes in Sellers' workload are not even comparable to the changes in working conditions the Plaintiffs in each of those cases experienced. In *Wilkie*, the Plaintiff complained only of comments made by a superior that she felt were disparaging—not a severe increase in duties. *Wilkie*, 638 F.3d at 954. In *Sallis*, the "minor change" involved the employee's transfer to a different location in the same town and a different shift but did not involve an increase in duties, change in duties, or

53

increase of hours. *Sallis*, 408 F.3d at 472–73. The Court's comparison of Sellers' insurmountable workload of approximately three or more fulltime positions with these two cases further evidences its refusal to view the evidence in the light most favorable to Plaintiff as these cases are nothing like the facts involved in this case. The extreme increase in work duties experienced by Sellers constituted a tangible change in working conditions that adversely affected his employment.

## c. Conclusion

An adverse employment action is a tangible change in working conditions that produces a material employment disadvantage." *Spears v. Missouri Dept of Corrections and Human Resources*, 210 F.3d 850, 852 (8th Cir. 2000) (citing *Cossette v. Minn. Power & Light*, 188 F.3d 964, 972 (8th Cir. 1999)). Sellers' adverse employment action is the result of a multitude of events and facts, not an isolated event. First, Sellers became victim to D'Cruz's systematic removal of the "old farts" in his department by mapping Sellers to a position with far fewer promotional opportunities than the job he was actually performing. As a result, Sellers would not be able to pursue the higher levels of the Process Pro position which would be accompanied by greater pay. At the same time, D'Cruz was setting Sellers up to fail in his current position as Process Pro by giving him more work

54

than one person could possibly successfully perform. When he could not keep up, justification arose for D'Cruz to give him poor performance evaluations and strip him of his supervisory duties. None of these changes in working conditions, in isolation, is a "minor" change that would preclude him from establishing an adverse employment action. Thus, taken as a whole, Sellers certainly suffered a tangible and material change in his working conditions by the accumulation of these events. Stripping an employee of future career prospects and producing a material disadvantage, as was done here, is the very definition of an adverse employment action as the Court points out in its own decision. App. 1627 (citing *Jackman*, 728 F.3d at 804).

The Court's categorization of Sellers' adverse action as involving only "minor" changes and the repeated mantra that his pay, benefits, and hours did not change are a mischaracterization of the record and a view of the evidence in the light most favorable to the Defendants, rather than Sellers, as the law requires. Clearly, Sellers' own testimony, which must be taken as true, indicates that his hours significantly changed. Sellers' own testimony, which must be taken as true, indicates that his supervisory duties were stripped from him. John Deere's own description of the GJE process indicates that Sellers should have been mapped to the GJE job title, Process

55

Pro—the title that matched at least 80% of his job duties—rather than the Supply Management Specialist III position that D'Cruz mapped him to. Any evidence that disputes these facts become issues of material fact that must be determined by a jury. The Court's weighing of the disputing evidence and determination of these factual issues is inappropriate and not in accord with the law. This case, and specifically the issue of whether Sellers suffered an adverse employment action is dripping in genuine issues of material fact; the grant of summary judgment on this ground was without basis and wholly inappropriate and erroneous.

## V.     **Sellers suffered from a "disability"within the meaning of the ADA.**

The District Court erred in its determination that Sellers did not suffer from a "disability" as it is defined under the ADA. Sellers suffered from depression, anxiety, and posttraumatic stress disorder that substantially limited major life activities as the law requires.

The District Court discounts Sellers' submission of medical records in support of his assertion he suffers from a disability as defined by the ADA. App. 1632. While the diagnosis contained within the records is not dispositive of this legal question, the records themselves may still be used as

evidence of the major life activities with which the individual is substantially limited. Here, Sellers' disability caused him substantial difficulty with his ability to read, concentrate, think, and communicate which qualify as "major life activities." 42 U.S.C. § 12102(2)(A); *see* App. 1487–88.

The District Court also points to Sellers' deposition testimony where he agrees with counsel that he did not become disabled until after he took medical leave. App. 1632. Relying on a lay person's interpretation of the term "disability" and making this dispositive on the legal issue of whether he suffered from a disability for ADA purposes is an inappropriate reliance on the District Court's part. Rather, Sellers' own account of his symptoms as recorded by his therapist and his therapist's observations would be an appropriate consideration, and in this regard, the evidence supports a finding that he was in fact disabled as it is defined under the ADA.

## VI. Sellers engaged in statutorily protected conduct by opposing unlawful employment practices by Clyde D'Cruz.

The District Court determined that Sellers' action for retaliation fails because he did not engage in statutorily protected activity. App. 1634. In support of this determination, the District Court cites to no authority. *See id.*

An employer may not take adverse action against an employee because the employee has opposed any practice made an unlawful employment practice. *Wallace v. DTG Operations, Inc.*, 442 F.3d 1112, 1118 (8th Cir. 2006). The record is clear that Sellers specifically warned D'Cruz that his statements about older employees reflected age discrimination, and he should be careful and "temper his words." App. 496 [Sellers dep. p. 22:20– 23: 8]. Discrimination based on a person's age—as was occurring by D'Cruz's conduct—is an "unlawful employment practice" under the ADEA, and Sellers opposed D'Cruz's discriminatory practices outright and directly. This is, by definition, statutorily protected activity.

## VII. **Sellers was subjected to adverse employment action by Clyde D'Cruz due to his opposition of D'Cruz's discriminatory practices.**

As aforementioned, Sellers engaged in statutorily protected conduct by outwardly and directly opposing D'Cruz's discriminatory conduct targeted at the older employees in Supply Management. Sellers' opposition occurred directly prior to the same adverse employment actions alleged to also be the product of direct age discrimination—discussed in Section IV of the Argument of this Brief, Sellers directs the Court to those arguments as reasserted herein. Thus, whether the Court wants to categorize the adverse

58

acts taken against Sellers as being the product of D'Cruz's retaliation for outwardly opposing his discriminatory conduct against older employees or being the victim of that same discriminatory conduct as an older employee himself, the damage to Sellers is the same.

## VIII. **Genuine issues of material fact exist as to Sellers' claim for hostile work environment**.

The District Court held that there are no genuine issues of material fact to survive the Defendants' motion for summary judgment as it related to Sellers' hostile work environment claim. In doing so, the District Court points to the legal standard requiring that a hostile work environment claim must be severe and pervasive and that Sellers' "two incidents" does not rise to this level or are causally related to his protected group status. App. 1637– 38. The District Court's error becomes obvious when, in viewing the evidence in the light most favorable to Sellers, it is only able to point to two incidents involved in Sellers' claim. In viewing the voluminous record in the light most favorable to Sellers, he complained of many more incidents than just two. Furthermore, the conduct was consistent, intimidating, and physically threatening to Sellers; and the conduct was so severe it caused Sellers to be diagnosed and treated for posttraumatic stress disorder—a

59

disorder he continues to be treated for presently as a result of D'Cruz's conduct.

Hostile work environment claims are not isolated incidents, but rather entail ongoing and repeated conduct. The following reflects the conduct that was so severe and persistent that it threw Sellers into a mental downward spiral requiring ten years (and counting) of psychiatric care:

- Sellers was confronted by D'Cruz in a physically intimidating manner— coming within inches of his face and backing him against a wall and spitting on him;

- D'Cruz threw a table against the wall in a violent way as he got up from a meeting with Sellers;

- D'Cruz patronized Sellers in front of other managers, unjustifiably criticizing his work;

- D'Cruz made persistent negative comments about older employees directly to Sellers despite Sellers being within the same age group as those employees;

- D'Cruz refused to put any job duties or requests in writing for Sellers despite knowing his need for such in order to succeed at his job;

60

- D'Cruz blamed Sellers for failing an outside audit despite admitting he was responsible for the results;

- Sellers was prohibited from using a conference room despite having a medical need to do so due to his struggles with concentration due to his depression and anxiety;

- D'Cruz intentionally sent Sellers in a number of directions, setting him up to fail.

Perhaps the most crucial factor in Sellers' claim is the fact that D'Cruz had the plan to drive Sellers out of the workforce and thus the motivation to create an environment encouraging Sellers to fail and leave the company. One of his tactics used to do this was to attack Sellers' character, drive down his morale, and throw him in so many directions he was bound to fail. All of these factors and events play a role in Sellers' hostile work environment claim; and in its entirety, this conduct rose to the demanding standard required by this Court.

No one factor is singularly determinative of whether a work environment is hostile. *Rheineck v. Hutchinson Tech., Inc.*, 261 F.3d 751, 757 (8th Cir. 2001). Thus, the relevant factors for determining whether the conduct is sufficient—frequency, severity, physical threatening, humiliating,

61

or whether it unreasonably interfered with an employee's work performance—must be considered in this analysis. The District Court appears to focus on only the frequency of the conduct. Yet, in viewing the evidence in the light most favorable to Sellers, the conduct suffered at the hands of D'Cruz and John Deere was so severe and interfered with Sellers' work performance to such a degree that he was forced to go on medical leave due to work-related posttraumatic stress disorder. This fact alone creates a scenario that points to genuine issues of material fact that indicate a jury should decide whether a hostile work environment existed in this matter.

## **CONCLUSION**

As the District Court points out, the record in this matter is voluminous. And for very good reason: this case is complex, fact-laden, document-driven, and the results of this case heard by a jury will hinge significantly on the credibility of witnesses. And, the issues turn on the intent behind the actions of Clyde D'Cruz. This case is simply not appropriate for summary judgment. In viewing the evidence in the light most favorable to the Plaintiff, Sellers has, at the very least, created a significant number of genuine issues of material fact that must be decided by a jury. The travesty of the District Court's decision amounts to a trial by

62

paper and does not reflect the proper legal standards required by Rule 56.

The Plaintiff respectfully requests the Eighth Circuit Court of Appeals

REVERSE the District Court's dismissal of this case and remand for trial.

## CERTIFICATE OF COMPLIANCE WITH F.R.A.P. 32(a)(7)

This Brief contains 13,882 words, excluding the parts of the Brief exempted by Fed. R. App. P. § 32(a)(7)(B)(ii), and therefore is within the words allowed by Fed. R. App. P. § 32(a)(7)(B)(i).

This Brief complies with the typeface requirements of Fed R. App. P. 32(a)(5) and the typeface requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word 2010 in Times New Roman font, 14 point.

Respectfully submitted:

HOPKINS & HUEBNER, P.C.

By_ /s/ Amy B. Pellegrin_____
   Amy B. Pellegrin
   2700 Grand Avenue, Suite 111
   Des Moines, IA 50312
   Telephone: (515) 244-0111
   Facsimile: (515) 244-8935
   apellegrin@hhlawpc.com

ATTORNEY FOR APPELLANTS

## PROOF OF SERVICE AND CERTIFICATE OF FILING

I certify that on the ___ day of _____, 2014, I served this document by mailing two (2) copies to all other parties in this matter at their respective addresses shown below pursuant to 8th Cir. R. 28A(a):

> Frank Harty
> Angel A. West
> Debra L. Hulett
> Frances M. Haas
> Ryan W. Leemkuil
> NYEMASTER GOODE, P.C.
> 700 Walnut Street, Suite 1600
> Des Moines, IA 50309-3899
> ATTORNEYS FOR APPELLEES

I further certify that I arranged for the filing of this Appellant's Brief on the ___ day of _____, 2014, in accordance with 8th Cir. R. 28A(a) by mailing ten (10) copies to the Clerk of Court, United States Court of Appeals, Eight Circuit, 111 South 10th Street, St. Louis, Missouri 63102.

Respectfully submitted:

HOPKINS & HUEBNER, P.C.

By /s/ _____

Amy B. Pellegrin
2700 Grand Avenue, Suite 111
Des Moines, IA 50312
Telephone: (515) 244-0111
Facsimile: (515) 244-8935

65

apellegrin@hhlawpc.com

ATTORNEY FOR APPELLANTS

## ATTORNEY'S COST CERTIFICATE

I hereby certify that the actual cost paid for the printing of the foregoing Appellant's Brief was $_____.

Respectfully submitted:

HOPKINS & HUEBNER, P.C.

By  /s/ _____

Amy B. Pellegrin
2700 Grand Avenue, Suite 111
Des Moines, IA 50312
Telephone: (515) 244-0111
Facsimile: (515) 244-8935
apellegrin@hhlawpc.com

ATTORNEY FOR APPELLANTS

## ATTORNEY'S SCAN FOR VIRUSES

I hereby certify that this brief and the addendum were scanned for viruses pursuant to 8th Cir. R. 28A(k) and are virus free.

By  /s/ Amy B. Pellegrin _____

Amy B. Pellegrin
2700 Grand Avenue, Suite 111
Des Moines, IA 50312
Telephone: (515) 244-0111
Facsimile: (515) 244-8935
apellegrin@hhlawpc.com

ATTORNEY FOR APPELLANTS

67